## STATE, EX REL. CITY OF INDIANAPOLIS, *v.* THE INDIANAPOLIS UNION RAILWAY COMPANY.

[No. 19,691.   Filed February 4, 1903.]

MANDAMUS.—*Demurrer to Alternative Writ.*—The question raised by a demurrer to the alternative writ is not whether the relator, under the fact, is entitled to some form of relief, but whether he is entitled to the specific relief prayed for.   *p. 46.*

MUNICIPAL CORPORATIONS.—*City of Indianapolis has no Power to Require Elevation of Railroad Tracks.*—Under the provisions of §23 of the Indianapolis city charter (§3794 Burns 1901), by which the city of Indianapolis is empowered to declare by ordinance what shall constitute a nuisance, to prevent the same, require its abatement, and to require railroad companies to change the grade and crossings of their respective roads, and to raise and lower their tracks to conform to any grade which may be established, the city has no power to enact an ordinance requiring all railroad companies operating within the city limits to elevate their tracks over all streets within a certain described district.   *pp. 53–57.*

SAME.—*Power of City.*—Municipal corporations can do no act for which authority is not expressly granted or may not be reasonably inferred or implied.   *pp. 57, 58.*

SAME.—*Nuisance.*—*Power of City to Define.*—The general authority granted by a city charter to declare what shall constitute a nuisance does not empower it to declare anything to be a nuisance *per se* which in fact was not recognized as such by the common law.   *pp. 58, 59.*

From Superior Court of Marion County; *Vinson Carter,* Judge.

Mandamus by the State, on the relation of the city of Indianapolis, against the Indianapolis Union Railway Company to compel the elevation of tracks.   From a judgment sustaining a demurrer to the alternative writ, relator appeals.   *Affirmed.*

*J. W. Kern*, *J. E. Bell* and *E. D. Salsbury* (*amicus curiae*), for appellant.

*Albert Baker* and *Edward Daniels*, for appellee.

JORDAN, J.—The State of Indiana, on the relation of the city of Indianapolis, instituted and prosecuted this action in the lower court for a writ of mandamus, seeking thereby to coerce appellee, a corporation owning and controlling a series of railroad tracks in said city, to elevate its tracks at and between certain street crossings. An alternative writ of mandate was issued upon the petition filed. This writ contained all of the material facts averred and set out in the petition. The writ, as issued, commanded the defendant to commence, without delay, the work of removing its railroad tracks where the same crossed the streets named, and in lieu thereof to construct elevated railroad tracks "in such a manner as not to interfere with public travel on any of the streets named, and in compliance with the provisions of the ordinance of the common council of the city of Indianapolis, passed on the 23d day of August, 1899." In response to the alternative writ the appellee, defendant below, appeared and demurred thereto for insufficiency of facts. The demurrer was sustained, and judgment was rendered against the relator.

Error is assigned on the ruling of the court in sustaining this demurrer, and the question presented in this appeal for our decision is, do the facts contained in the alternative writ entitle the relator to the specific right which it claims, or do they justify the command or order of the alternative writ? For the rule is well settled in mandamus proceedings that on a demurrer to the alternative writ the question presented or raised is not, as is the case in an ordinary action, whether the relator under the facts is entitled to some form of relief, but the question raised is as to whether he is entitled to the specific relief prayed for; or, in other words, can the specific order or command of the alternative writ, under the facts therein averred, be justified. *Vide*

Merrill, Mandamus, §§255, 256, and cases cited in support of the text; *Applegate* v. *State, ex rel.,* 158 Ind. 119; *State, ex rel.,* v. *Commercial Ins. Co.,* 158 Ind. 680, and cases cited.

The following are, in the main, the facts set out in the alternative writ: There is a terminal of some fourteen railroads within the city of Indianapolis, which is an incorporated city and contains a population of more than 100,000, and is acting under and controlled by the provisions of an act approved March 6, 1891 (Acts 1891, p. 137), commonly known as the Indianapolis charter. The defendant is a corporation organized and incorporated pursuant to the statutes governing the incorporation of union railway companies, and is now and has been for many years engaged in maintaining a union railway station in said city, and owning and controlling numerous railroad tracks in said station, extending east and west therefrom through a populous part of said city, across Meridian, Pennsylvania, Delaware, Alabama, New Jersey, and East streets on the east, and Capitol avenue, Senate avenue, and other streets on the west; that passing over said tracks extending to the east of said Union Station are all the passenger engines and tenders, and all the passenger, baggage, express, and mail cars run and operated in and through said city, by the following lines of railway: Here follows an enumeration and statement or description of nine divisions of railroads which run into and through the city of Indianapolis. It is alleged that not less than eighty passenger trains, operated by the various companies named, pass over the said tracks of defendant, which run east from said Union Station, every twenty-four hours, which trains run at a high rate of speed, and cross the streets named, and that during certain times named the intervals between the passing of such trains are very short. The time of arrival and departure of all of these several trains at and from the Union Station is here set out; that passing over the tracks extending west

from said station are all the passenger trains of the following lines of railroad: (a) The Chicago division of the Big Four Railway Company, a thoroughfare extending from Indianapolis to Chicago, and connecting with the various other divisions of said road centering in Indianapolis. (b) The Peoria division of said Big Four Railway Company, extending from Peoria, Illinois, and connecting at Indianapolis with the other divisions of that railroad in said city. (c) The St. Louis division of said Big Four Railway Company, extending from Indianapolis to St. Louis. (d) The Terre Haute & Indianapolis (commonly called the Vandalia) Railroad, which connects Indianapolis and St. Louis. (e) The Indiana, Decatur & Western Railroad, which runs from Indianapolis to Decatur, Illinois, having eastern and western connections at terminal points. (f) The Indianapolis & Vincennes Railroad, operated by and as a part of the Pennsylvania railroad system, extending from Indianapolis to Vincennes, having connections with other points.

That not less than fifty-seven passenger trains, operated by the several companies named, arrive and depart from the west end of said station every twenty-four hours, many of them at short intervals, crossing Capitol avenue and Senate avenue at a high rate of speed; that the tracks over which said trains are run extend in a general easterly and westerly direction through the central part of said city; that the population of said city when said tracks were first laid was not to exceed 20,000; that said population is now about 180,000; that the principal thoroughfares of said city connecting that part of the city south of the tracks with that part lying to the north thereof are the above named streets, which are crossed by the tracks aforesaid; that the part of the city devoted to mercantile business, both wholesale and retail, is situated north of the tracks, while on the south side thereof there are large factories, and at least one-third of the entire population of said city resides

on that side; that the streets so crossed by said tracks are constantly used by the people of said city in passing backwards and forwards between the different parts thereof, from factories to stores, and from residences to places of business, such streets being the principal thoroughfares for public travel; that in the necessary and proper movement of the people of said city in the transaction of their daily business, in the attending of schools by children, and the attending of churches and other public places by all, large numbers of men, women, and children are each day and night required to travel upon said streets where the same are crossed by defendant's tracks, and that no less than 40,000 people are compelled to and do pass daily on and over said tracks, such travel being by pedestrians and those driving in wagons and other vehicles; that when the trains aforesaid are running across such streets at the intervals above set out, some arriving and others departing, the engines emitting large volumes of smoke, the bells thereof ringing, the whistles thereon sounding, and all running at high speed, there is constant danger to the lives of all persons who are traveling in and upon any of such streets at such points of crossing; that within two years last past many inhabitants of said city have been killed at such crossings, and many more seriously injured, by engines and cars running upon and against them while they were endeavoring to travel in said streets, as they had the right to do, at the points aforesaid; that by reason of the increased and increasing volume of railroad traffic, the necessity for more engines and cars, the more constant use of said tracks is constantly increasing, while by reason of the increase in the population of said city, on both sides of said tracks, the necessity for more travel across such tracks is also constantly increasing, so that dangers to life and property by reason of such crossings are also increasing in corresponding proportion to

such increase of railway traffic and population; that the continued existence of such tracks upon and over the streets named has become and is wholly inconsistent with the use of said streets for public travel, and said continued existence is a constant menace to the lives of all the people using the same at the points aforesaid; that it is necessary, in order to make such streets and highways at such crossings reasonably safe for the inhabitants of said city making proper use thereof, and for property being conveyed along the same, and to restore said streets so occupied by said tracks so that they may be safe and convenient for public travel, that the surface of said streets should not be occupied by such tracks, or any tracks used for the passage of locomotive engines and railroad cars propelled by steam, and that such railway tracks should be removed from the surface of such streets with all reasonable dispatch; that the common council of said city, on August 23, 1899, recognizing the evils, hereinbefore recited, attempted to remedy the same by the passage of an ordinance entitled: "An ordinance for the restoration of highways and streets in the city of Indianapolis, whose surface is occupied by railroad tracks, by the removal of such tracks, and for the removal of railroad tracks from the surface of streets and highways in such city; providing penalties for its violation, and fixing a time when the same shall take effect," which ordinance, being properly approved, took effect, and is now in force; that by reason of the facts hereinbefore recited and stated the city ordinance under its terms declares the railroad crossings in said city to be nuisances, and that the continuation of such crossings at grade is entirely inconsistent with the use of such streets for travel by the public, and the ordinance among other things provides: That all railroads and railroad tracks and structures upon the surface of the streets and highways, within a designated territory in said city, called the first district, which district included all the streets and crossings described in the

complaint and writ, should be removed therefrom on or before the 1st day of September, 1901, and should not thereafter be relaid; that every railroad track existing or being upon any public street or highway at grade, contrary to the provisions of said ordinance, is declared to be a nuisance, the same being a menace to life and property therein, and a serious interference with the comfort, safety, and convenience of the public; that after the time therein limited for the removal of such tracks, the board of public works of said city shall be authorized and directed to cause the same to be removed and abated; that any corporation, person, or persons, who should construct, operate, or maintain any railroad tracks upon the surface of streets, contrary to the provisions of such ordinance, should be liable to a penalty of $200 per day; and said ordinance also provided that, subject to the limitations, conditions, reservations, and exceptions contained therein, "the consent of the common council is hereby given to all persons and corporations now owning or operating any railroad or railroad tracks upon the surface of any of the streets or highways, within the limits of said city, heretofore constructed upon or across the same, in pursuance of lawful authority, to construct, maintain and operate elevated railroads in lieu thereof." That among the conditions imposed by said ordinance upon which such railroad companies might maintain elevated tracks in lieu of the tracks at grade, as at present, was the condition, "that the work of constructing each of said elevated railroads within said first district shall be commenced not later than the 1st day of April, 1900, and completed not later than the 1st day of September, 1901," and the further condition, "that each person or corporation desiring to construct any elevated railroad shall first submit plans and specifications therefor to the board of public works for its approval, and that the construction of such elevated railroads shall be upon plans and specifications approved by said board, and not other-

wise." Under the ordinance in question the railroad companies are authorized and required to construct elevated tracks and roadbeds, and it is provided that such roadbeds and tracks shall be upheld by iron and steel cross girders, these to be supported by iron and steel posts. The girders are required to be fully fourteen feet above the established grade of the streets, and the roadbeds and tracks are to be so elevated as not to interfere with the travel of the public upon the streets. The ordinance goes into detail as to the manner of constructing the elevated tracks, and as to the rights of the companies to construct, maintain, and use telegraph, telephones, and signal service for their own exclusive use along and upon said elevated railroad. It further provides: "That the persons or corporations constituting or owning any elevated railroads in pursuance hereof, as well as their lessees, successors, and assigns, shall forever indemnify and save harmless the city of Indianapolis from any and all damage, judgments, decrees, costs, and expenses for which it may be made liable, or which may be recovered against it by reason of its having consented to the construction, maintenance, or operation of such elevated railroads." This ordinance is set out and made a part of the petition and alternative writ. It is further alleged in said writ that after the 1st day of April, 1900, a written demand was made upon the defendant and all railroad companies running trains over the tracks in question, requesting and directing them to proceed with the work of constructing elevated tracks in lieu of the tracks now maintained by them, and each of them, but that each and all of said companies have failed and refused to comply with said request and demand; that defendant and all said companies have failed to submit to the board of public works of said city any plan or specifications for the construction of such elevated tracks, but that, on the contrary, the defendant and all the companies owning or operating through their duly authorized agents and officers, have given out that it is their purpose

to ignore the provisions of said ordinance, and announced their determination to continue to maintain the said tracks at grade, and to operate over and on the same the trains of cars hereinbefore described; and if said work of elevating the tracks in question, and constructing an elevated railroad in accordance with the provisions of said ordinance should be commenced at the date of the return of this proceeding, it would have to be prosecuted with extraordinary diligence to complete the same by the 1st of September, 1901; that it is 'the purpose of the defendant to refuse to take any steps looking to the elevation of the tracks until after September 1, 1901, and then to continue such refusal and contest the validity of said ordinance; that such delay will result in a continued loss of life and the indefinite continuation of the perils and dangers hereinbefore recited; that the construction of elevated railroads or tracks by said defendant and by said other corporations is the proper and only feasible remedy for the evils and dangers complained of which will give to the people the free, safe, and unobstructed use of their public streets and thoroughfares for travel, without in anywise interfering with the running of the trains of the said railroad companies, which are necessarily used in the transportation of passengers throughout the country.

An examination of the facts set out in the petition and alternative writ disclose that the relator does not base the right which it seeks to enforce against the appellee upon the fifth clause of §5153 Burns 1901 of the general law relating to the organization and control of railroad companies, but founds the right which it claims and asserts upon the ordinance adopted by its common council, wherein the crossings as they are maintained are declared to be nuisances. The relator, under the circumstances, then, in maintaining the right which it claims, must stand or fall upon the ordinance which it advances in support of its claim. The question, therefore, with which we have to deal, is one relating

to the power of the city under the law to adopt the ordinance involved, and thereunder compel appellee to remove the surface tracks of its railroads, and substitute instead thereof a system or series of elevated tracks in the prescribed district over which it must operate or run its cars.  Counsel for appellant argue that the ordinance in question is sustained by the police power of the State, which it is said may be exercised directly by the latter, or that it may be delegated by it to municipal corporations.  It may be conceded, *arguendo,* that the authority of the relator herein, if it is invested with such power to require appellee to abolish its grade crossings and elevate the tracks of its roads above the surface of the public streets in order to protect the lives and property of those using the same, rests upon the police power of the State, which the latter through its legislative department may delegate to or confer upon municipal corporations.  That this power extends to and may be exercised to protect the lives and property of the people, and also to promote their health and morals, is universally recognized.  That the right to exercise this power can not be bargained or bartered away, either by the State or by any of its governmental subdivisions upon which it has been conferred, is equally well settled.

In *State* v. *Gerhardt,* 145 Ind. 439, 33 L. R. A. 313, this court, in speaking in regard to the extent of the police power, said: "The police power of a State is recognized by the courts to be one of wide sweep.  It is exercised by the State in order to promote the health, safety, comfort, morals, and welfare of the public.  The right to exercise this power is said to be inherent in the people in every free government.  It is not a grant, derived from or under any written constitution.  It is not, however, without limitation, and it can not be invoked so as to invade the fundamental rights of a citizen.  As a general proposition, it may be asserted that it is the province of the legislature to decide when the exi-

gency exists for the exercise of this power, but as to what are the subjects which come within it, is evidently a judicial question."

These well settled propositions, however, do not solve the question which confronts us in this appeal, for the inquiry still remains, has the legislature delegated to or conferred upon the relator herein any such power as will authorize that which it seeks to enforce under the ordinance in controversy? Counsel for appellant refer us to §23 (§3794 Burns 1901) of the act commonly known as the charter of the city of Indianapolis. It is claimed that under the several provisions of that section ample power to deal with the problem presented has been conferred upon relator's common council. This section provides that the common council shall have power to enact ordinances for the following purposes: "To declare what shall constitute a nuisance, to prevent the same, require its abatement, authorize the removal of the same by the proper officers, and provide for the punishment of the person or persons causing, continuing or suffering the same to exist, and to assess the expenses of its removal against such person or persons, and provide for collecting such expenses either by placing the same on the tax-duplicate or by suit.    *    *    *    To secure the safety of citizens and others, in the running of trains, in or · through such city; to require persons or corporations, owning or operating railroads, to fence their respective railroads, to construct cattle-guards, street crossings, and viaducts, and public roads, and to keep the same in repair and safe condition for persons on foot, in vehicles, or otherwise; to keep flagmen at railroad crossings, and provide protection against injury to persons or property from the operation of said railroads. To authorize and require railroad companies to change the location, grade and crossings of their respective railroads; to compel them to raise or lower their railroad tracks to conform to any grade which may be established by such ordinance; to compel per-

sons or companies owning or operating railroads to construct bridges, viaducts or tunnels, and approaches thereto, across their respective railroads or rights of way, at street or alley crossings; to compel railroad companies to make and keep open and in repair ditches, drains, sewers and culverts, along and under their respective tracks. To compel railroad corporations, or persons owning or operating railroads to keep gutters and street crossings clean along their right of way. To prohibit the laying of any railroad track across any street or alley or public place, without permission first obtained therefor from the department of public works, and to provide for the taking up and removing any track so laid, without notice, and charge the expense thereof against the offending person or corporation. To require any person or company, owning or operating any railroad, to take up and change the location of any railroad track or switch heretofore or hereafter laid within the limits of said city."

It can not in reason be asserted from the mere fact that the relator is invested with some of the police power of the State in regard to the running or operating of railroads within its corporate limits, that it necessarily follows, under the circumstances, that it has unlimited power to deal alike with all of appellee's railroad crossings, and confine it to the particular or specific method or means of elevated tracks to be constructed by it at all of its crossings, regardless of the existing conditions and circumstances applicable thereto, in order to afford safety or protection to the public.

In regard to the power of the State to confer or delegate the extraordinary authority which the relator, under its charter, claims to have, we need not discuss nor decide, for that is not the question herein involved.

Under the provisions of §23, *supra,* by which the relator is empowered to require railroad companies to change the grade and crossings of their respective roads, and to raise or lower their tracks in order to conform to any grade which

may be established by ordinance, certainly the broad and extraordinary power of abolishing grade crossings within the city, and compelling the companies to construct and maintain a system of elevated tracks, as exacted by the ordinance in issue, was not intended or contemplated by the legislature. It appears that in order to afford protection to the public using the streets of the city, §23, *supra,* points out, or enumerates, some of the means which the city may compel railroad companies to employ for that purpose, among which is mentioned, to keep flagmen at their crossings, and to construct bridges, viaducts, or tunnels at street or alley crossings, but there is nothing in the section to indicate that it was the legislative intent to invest relator's common council with the extraordinary power to impose upon railroad companies the duty or obligation of removing their railroad tracks from the surface of the streets where they were legally authorized to be located, and construct, in lieu thereof, a series of elevated tracks, as contemplated by the ordinance involved, over which they must run, or operate, their cars. Under the plain language of this section there is no room to work out or hold by judicial construction that the legislature intended to confer upon the relator the power, either expressly or impliedly, to compel appellee to employ the particular and specific method, regardless of all others, of elevating its railroad tracks as prescribed by the ordinance. If we entertained a reasonable doubt, which we do not, of relator's being invested with such power, we would be required under such circumstances to solve the doubt against it, and deny the existence of the power. *Pittsburgh, etc., R. Co.* v. *Town of Crown Point,* 146 Ind. 421, 422, 35 L. R. A. 684; *Bogue* v. *Bennett,* 156 Ind. 478, 83 Am. St. 212; Dillon, Mun. Corp. (4th ed.), §89; *City of Crawfordsville* v. *Braden,* 130 Ind. 149, 14 L. R. A. 268, 30 Am. St. 214; *Adams* v. *City of Shelbyville,* 154 Ind. 467.

The general rule is well affirmed that municipal corporations derive their powers from the legislature, and where

a power to such corporations is expressly granted or necessarily implied or inferred it should not be defeated or denied by a stringent judicial construction, but, nevertheless,
the proposition that they can do no act for which authority
is not expressly granted or may not be reasonably inferred
or implied is well settled by the authorities. *Kyle* v. *Malin,*
8 Ind. 34; *Smith* v. *City of Madison,* 7 Ind. 86; Dillon,
Mun. Corp. (4th ed.), §90.

The power of relator may be conceded, *arguendo,* either
under its charter law or under clause 5 of §5153 Burns
1901, where any particular railroad crossing over its public
streets by reason of the peculiar or particular circumstances
or conditions thereof can only be made safe for public
travel thereover by elevating the tracks of the road, to compel the railroad company to discharge such duty or obligation. But certainly such authority under the existing laws
can not be extended by construction so as to warrant the
relator in coercing appellee to construct and maintain a system of elevated tracks for all of its various roads running
into and through the city of Indianapolis. The *ultimatum*
presented to appellee by the ordinance in question was to
remove the surface tracks of its roads, and construct and
maintain elevated tracks over all of the crossings in the
prescribed district, without regard to the conditions or circumstances of any particular crossing. The same means,
without distinction, were to be provided for all crossings,
irrespective of circumstances or conditions. This court,
in *Chicago, etc., R. Co.* v. *State, ex rel.,* 158 Ind. 189,
quoted with approval §1107 of Elliott, Railroads, where the
author says: "Each particular crossing presents different
conditions, but the general rule governing all is the same,
and that rule is that the company must erect whatever structures are reasonably necessary to the safety and convenience
of the traveler using the crossing."

The fact that relator's common council, under the ordinance in controversy, has by its own fiat declared all of

appellee's railroad crossings to be nuisances, does not justify the demand that by reason of such declaration appellee must remove its surface tracks and construct instead thereof a series of elevated ones.   The general authority as granted by its charter to declare what shall constitute a nuisance does not empower it to declare anything a nuisance *per se* which in fact was not recognized as such by the common law.   Its common council, under such general grant of power, may, within recognized limits, by ordinance define or declare what things or classes of things may, and under what circumstances or conditions they may become or shall be deemed to, constitute a nuisance, and may prescribe within the authorized limit what the penalty shall be upon conviction of the offending party.   Certain things by reason of their nature or character are considered by the law a nuisance *per se,* while on the other hand there are other things which may or may not be a nuisance, their character as such being a question of fact depending on the particular circumstances of the case.   *City of Evansville* v. *Miller,* 146 Ind. 613, 38 L. R. A. 161; *First Nat. Bank* v. *Sarlls,* 129 Ind. 201, 13 L. R. A. 481; *Chicago, etc., R. Co.* v. *City of Joliet,* 79 Ill. 25; *City of St. Louis* v. *Heitzeberg, etc., Co.,* 141 Mo. 375, 42 S. W. 954, 39 L. R. A. 551, 64 Am. St. 516; Dillon, Mun. Corp. (4th ed.), §374.

Judge Dillon, in the section last cited, in considering the powers of municipal corporations to declare and abate nuisances, properly says:   "Such power, conferred in general terms, can not be taken to authorize the extrajudicial condemnation and destruction of that as a nuisance which, in its nature, situation, or use, is not such."

The crossings of appellee's railroads over the public streets of the city were authorized by law, and if they are so maintained as to become nuisances that is a question of fact to be judicially determined upon a case properly presented.   Counsel for appellant assert that the facts set out in the petition and alternative writ disclose such a condi-

tion of affairs which a court can not afford to tolerate. But it must be remembered that this action is not one to abate a nuisance, but is a suit wherein the extraordinary remedy of mandate is sought, and, in testing the sufficiency of the pleading, consideration must be had only for facts well pleaded and not for legal conclusions. We have previously shown that in cases of the character of the one at bar, the only province of a court is to decide whether, upon the facts alleged in the alternative writ, the relator is entitled to be awarded the specific relief or right demanded. The functions of a court are not of a legislative character, and while the state of affairs, as counsel claim, may possibly be of a very grievous or intolerate nature, nevertheless it is not in our power to declare a law under which the relator may be enabled to secure the relief which it seeks by way of the particular method which it advances and demands for the object or purpose in view. If it has unsuccessfully exercised all of the power in the premises with which it has been invested by the legislature, and believes that the only remedy for the evil complained of is to compel appellee to construct and maintain an elevated railroad within the prescribed territory over which it must run or operate its cars, then it would appear that its appeal should not be to the courts, but to the legislature for a further or additional grant of power under which the vast undertaking upon the part of appellee as contemplated by the ordinance involved could be enforced.

We have given this case a patient consideration, and have examined all of the authorities cited by appellant, and as a final conclusion we are constrained to adjudge that the relator had not, under the existing laws, the power to adopt the ordinance in question, and therefore is not entitled to the specific relief or right demanded.

The demurrer to the alternative writ of mandamus was properly sustained. Judgment affirmed.