CITY OF LOGANSPORT *v.* PUBLIC SERVICE COMMISSION
OF INDIANA ET AL.*
[No. 25,389. Filed July 1, 1931.]

*Reported and annotated 76 A. L. R. 838; reported P. U. R. 1931E 179; see Note VII Ind. Law Jour. 259.

*Thomas C. Bradfield, Mahoney & Mahoney* and *Fansler & Douglass*, for appellant.

*Arthur L. Gilliom*, Attorney-General, and *Edward M. White*, Assistant Attorney-General, for appellees.

MARTIN, C. J.—The city of Logansport, which owns and operates (and has for 30 years owned and operated) an electric light plant, paid for originally with funds raised by taxation, and enlarged and extended in part with funds raised by taxation and in part with surplus earnings of the plant, brought this action (under §12749 Burns 1926) to enjoin and set aside the operation of an order of the Public Service Commission of Indiana which reduced its rates or charges to the public for electric current or service. (These reductions varied as to different classes of service and amounts of current consumed, the reduction in some instances being as little as one-tenth of a cent per kilowatt hour and, in other instances, being as much as one cent per kilowatt hour.) The

order of the commission, which reviews the entire proceeding and the evidence before it and gives the commission's opinion regarding the law, covers more than 20 printed pages in the reports and it is impracticable to set it out here. It is reported, *Re Hillis, et al.* No. 8503 (1926, Ind. Pub. Ser. Comm.) P. U. R. 1927-A 443.

Demurrers to each of the four paragraphs of complaint were sustained, and judgment was rendered against the city upon its refusal to plead further. Error is assigned on the ruling upon the several demurrers. The theories of the several paragraphs of complaint are as follows:

*Paragraph I.* That the right to manage the electric light property and fix the rates to be charged is vested in the city by virtue of its inherent power as an independent body politic or by the right of local self-government, and that such rates cannot be controlled by the Legislature or by any commission appointed by it.

*Paragraph II.* That the law creating the Public Service Commission of Indiana (The Spencer-Shively Act) ch. 76, Acts 1913, §§12672-12802 Burns 1926, does not apply to municipally owned public utilities, and that the commission has no authority thereunder to fix the rates in question.

*Paragraph III.* That the rates fixed by the commission are inadequate and confiscatory, and are, therefore, unlawful and unconstitutional (under §21, Art. I, Constitution, §73 Burns 1926), in that they will yield only sufficient revenue to pay operating and maintenance charges and that they do not provide, and are not intended to provide, for a reasonable return by the way of interest or earning power upon the investment (i. e., a fair return upon the fair value of its property) the same as if it were a privately owned utility.

*Paragraph IV.* That the rates are insufficient because they do not yield a sum sufficient to compensate the city for the taxes which the plant would pay if it was privately owned.

### 1. The State has the power to regulate the rates to be charged by municipally owned public utilities.

Appellant, supporting its first paragraph of complaint, relies upon statements made by this court in the cases of *State, ex rel.,* v. *Denny* (1888), 118 Ind. 382, 21 N. E. 252, 4 L. R. A. 79; *State, ex rel.,* v. *Denny* (1888), 118 Ind. 449, 21 N. E. 274, 4 L. R. A. 65; *City of Evansville* v. *State, ex rel.* (1888), 118 Ind. 426, 21 N. E. 267, 4 L. R. A. 93; and *State, ex rel.,* v. *Fox* (1901), 158 Ind. 126, 63 N. E. 19, 56 L. R. A. 893, which announce the doctrine of the right of local self-government, to the effect that the people possess an inherent right, which antedates the Constitution, to govern themselves locally; that the Constitution is a grant of power, and that all power not delegated by it remains in "the local communities" (rather than in the State) exempt from legislative interference. From this, appellant argues that it has an inherent right to own and operate its electric light plant, to sell current to the public, and to do so entirely free from any control or regulation of its rates by the State. In the cases cited, it is held that, under the Constitution, the Legislature has no power, either directly or through the Governor, to appoint local municipal officers, but even this is not true where the functions of such officers are to be performed under the police power of the state. *State, ex rel.,* v. *Kolsem* (1891), 130 Ind. 434, 29 N. E. 595, 14 L. R. A. 566; *Arnett* v. *State, ex rel.* (1907), 168 Ind. 180, 80 N. E. 153, 8 L. R. A. (N. S.) 1192.

While the doctrine of the right of local self-government as laid down in the cases above cited (or at least a part of it), has been recognized in later cases (see *Street* v. *Varney* [1903], 160 Ind. 338, 66 N. E. 895, 61 L. R. A. 154, 98 Am. St. 325; *Jordan* v. *City of Logansport* [1912], 178 Ind. 629, 636, 99 N. E. 1061; *Winfield* v. *Public Service Comm.* [1911], 187 Ind.

53, 118 N. E. 531), it would seem that the inherent or common-law powers referred to are identical with those powers which are commonly designated as "implied" or "incidental" powers of a municipal corporation essential to enable it to accomplish the end for which it is created. *City of Crawfordsville* v. *Braden* (1892), 130 Ind. 149, 28 N. E. 849, 14 L. R. A. 268, 30 Am. St. 214; *First Nat. Bank of Mt. Vernon* v. *Sarlls* (1891), 129 Ind. 201, 28 N. E. 434, 13 L. R. A. 481, 28 Am. St. 185; *Bluffton* v. *Studebaker* (1886), 106 Ind. 129, 6 N. E. 1; *Clark* v. *City of South Bend* (1882), 85 Ind. 276, 44 Am. Rep. 13. This court has declared repeatedly (both before and since the decision of the three cases cited in 118 Indiana, in many cases which are collected in a footnote[1]), that municipal corporations are subordinate branches of the domestic government of the state and possess only those powers expressly granted to them by

---

[1] *City of Lafayette* v. *Cox* (1854), 5 Ind. 38; *Smith* v. *City of Madison* (1855), 7 Ind. 86; *Kyle* v. *Malin* (1856), 8 Ind. 34; *First Presbyterian Church, etc.,* v. *City of Ft. Wayne* (1871), 36 Ind. 338, 10 Am. Rep. 35; *Lewisville Nat. Gas Co.* v. *State, ex rel.* (1893), 135 Ind. 49, 34 N. E. 702, 21 L. R. A. 734; *Champer* v. *City of Greencastle* (1894), 138 Ind. 339, 35 N. E. 14, 24 L. R. A. 768, 46 Am. St. 390; *Pittsburgh, etc., R. Co.* v. *Town of Crown Point* (1896), 146 Ind. 421, 45 N. E. 587, 35 L. R. A. 684; *Vaughtman* v. *Town of Waterloo* (1896), 14 Ind. App. 649, 43 N. E. 476; *Gas Light, etc., Co.* v. *City of New Albany* (1901), 156 Ind. 406, 59 N. E. 176; *Walker* v. *Towle* (1901), 156 Ind. 639, 59 N. E. 20, 53 L. R. A. 749; *State, ex rel.,* v. *Indianapolis Union R. Co.* (1903), 160 Ind. 45, 66 N. E. 163, 60 L. R. A. 831; *Muncie Nat. Gas Co.* v. *City of Muncie* (1903), 160 Ind. 97, 66 N. E. 436, 60 L. R. A. 822; *Scott* v. *City of Laporte* (1903), 162 Ind. 34, 68 N. E. 278, 69 N. E. 675; *Voss* v. *Waterloo Water Co.* (1904), 163 Ind. 69, 71 N. E. 208, 66 L. R. A. 95, 106 Am. St. 201, 2 Ann. Cas. 978; *City of Elkhart* v. *Lipschitz* (1905), 164 Ind. 671, 74 N. E. 528; *East Chicago Co.* v. *City of East Chicago* (1909), 171 Ind. 654, 87 N. E. 17; *City of Delphi* v. *Hamling* (1909), 172 Ind. 645, 89 N. E. 308; *Frank* v. *City of Decatur* (1910), 174 Ind. 388, 92 N. E. 173; *Campbell* v. *Brackett* (1910), 45 Ind. App. 293, 90 N. E. 777; *Pittsburgh, etc., R. Co.* v. *City of Anderson* (1911), 176 Ind. 16, 95 N. E. 363; *City of South Bend* v. *Chicago, etc., R. Co.* (1913), 179 Ind. 455, 101 N. E. 628, Ann. Cas. 1915D 966; *Windle* v. *City of Valparaiso* (1916), 62 Ind. App. 342, 113 N. E. 429; *City of Indianapolis* v. *College Park Land Co.* (1918), 187 Ind. 541, 118 N. E. 356; *Central Union Tel. Co.* v. *Indianapolis Tel. Co.* (1920), 189 Ind. 210, 126 N. E. 628; *Angola, etc., Tile Co.* v. *Millgrove School Tp.* (1920), 73 Ind. App. 557, 127 N. E. 855; *Denny* v. *City of Muncie* (1925), 197 Ind. 28, 149 N. E. 639; *Bartless* v. *City of Garrett* (1929), 89 Ind. App. 349, 166 N. E. 437.

the Legislature, those necessarily or fairly implied in or incident to powers expressly granted, and those indispensable to the declared objects and purposes of the corporation.

The power of a municipality to own a public utility is generally considered to be neither an inherent nor an indispensable implied power, *Western Savings Fund Society* v. *City of Philadelphia* (1858), 31 Pa. St. 175, 72 Am. Dec. 730, and, to enable cities to operate utilities, the Legislature of this state has in numerous instances expressly granted that authority by statute. The right or power to construct, purchase, or lease electric light plants for the purpose of furnishing the inhabitants of the city and its vicinity with the use and convenience of such utility is granted by §249 *et seq.*, ch. 129, Acts 1905 p. 219, as amended by §4, ch. 191, Acts 1915 p. 689, §11129 Burns 1926. (See, also, §12771 Burns 1926.)

The power of a city to operate an electric-light plant to light the streets for purposes of safety, security and public convenience (like the power to operate a water plant to obtain adequate fire protection or water for the health and sanitation of a city), may well be included in the implied or incidental powers indispensable to the declared objects and delegated powers of a municipal corporation (and, in *City of Crawfordsville* v. *Braden, supra,* it was held that a city had implied or inherent power, not only to light its streets and to establish works to produce the electric current for that purpose, but also, in connection therewith, to furnish its inhabitants with light in their homes and places of business).

A city in the operation of an electric light utility, selling service to the public, acts in its private business

capacity and not in its public governmental capacity (regardless of whether its power to so act is inherent, implied or is granted by statute). The dual capacity or twofold character possessed by municipal corporations is: (1) governmental, public, or political;·and (2) proprietary, private or quasi-private. In its governmental capacity a city or town acts as an agency for the state for the better government of those who reside within its corporate limits, and, in its private or quasi-private capacity, it exercises powers and privileges for its own benefit, *Holmes* v. *City of Fayetteville* (1929), 197 N. C. 740, 150 S. E. 624, P. U. R. 1930A 369, 373; *Scales* v. *City of Winston-Salem* (1925), 189 N. C. 469, 127 S. E. 543. When a municipal corporation engages in an activity of a business nature rather than one of a governmental nature, such as the supply of light or water or the operation of a railroad, which is generally engaged in by individuals or private corporations, it acts as such corporation and not in its sovereign capacity, *American Aniline Products, Inc.*, v. *Lock Haven* (1927), 288 Pa. St. 420, 135 Atl. 726, 50 A. L. R. 121, P. U. R. 1927D 112; *New York, etc., Power Co.* v. *City of New York* (1927), 221 App. Div. 544, 224 N. Y. Supp. 564, P. U. R. 1927E 788, and a city operates its municipally owned utility plant in its proprietary capacity as a private enterprize subject to the same liabilities, limitations and regulation as any other public utility. *Town of Mapleton* v. *Iowa Pub. Ser. Comm.* (1929), 209 Iowa 400, 223 N. W. 476, 68 A. L. R. 993, P. U. R. 1929B 359.

Appellant agrees that, in the operation of the light plant, it does not exercise a political or governmental power, but exercises a private power, and, from that premise, concludes "therefore, the Logansport electric light plant is private property free from state control," citing: *City of Huntingburg* v. *Morgen* (1928), 90 Ind. App. 573, 162 N. E. 255, 258, 260, 163

N. E. 599; *Woodward* v. *Livermore Falls, etc.* (1917), 116 Me. 86, 100 Atl. 317, 319, L. R. A. 1917D 678; *Stanley* v. *Sangerville* (1920), 119 Me. 26, 109 Atl. 189, 190, 9 A. L. R. 348; *Oakes Mfg. Co.* v. *New York* (1912), 206 N. Y. 221, 99 N. E. 540, 541, 42 L. R. A. (N. S.) 286; and *Town of Holyoke* v. *Smith* (1924), 75 Colo. 286, 226 Pac. 158, which is discussed *infra* in footnote 2. Appellant's conclusion is erroneous (especially in the light of our statute, see discussion *infra*). See, also, *American Aniline Products, Inc.*, v. *Lock Haven, supra; New York, etc., Power Co.* v. *City of New York, supra; Kennebunk, etc., Water District* v. *Town of Wells* (1929), 128 Me. 256, 147 Atl. 188, P. U. R. 1930A 173.

The regulation of rates to be charged by public utilities is properly the function of the legislative department of the state government, under its police power, ▌ Pond, Public Utilities (3d ed.) 519-520; *Winfield* v. *Public Service Commission, supra; City of Washington* v. *Public Service Commission* (1921), 190 Ind. 105, 129 N. E. 401; *Hockett* v. *State* (1885), 105 Ind. 250, 5 N. E. 178; *Smyth* v. *Aymes* (1897), 169 U. S. 466. The power to fix rates for public utilities does not appertain to the government of a city, *Woodburn* v. *Public Service Commission* (1916), 82 Ore. 114, Ann. Cas. 1917E 996, and is not primarily a municipal matter, *Portland Ry., etc., Co.* v. *City of Portland* (1914), 210 Fed. 667, but rests primarily with the State, *Springfield Gas Co.* v. *Springfield* (1920), 292 Ill. 236, 126 N. E. 739, being a sovereign right belonging to the State in its sovereign capacity, *City of Kalamazoo* v. *Titus* (1919), 208 Mich. 252, 175 N. W. 480. It is not a power necessary to local self-government, denial of which, or interference with the exercise of which, by the Legislature, would be interference with local self-government, *City of Kalamazoo* v. *Titus, supra.* In *Winfield* v. *Public Service Commission, supra,* and *City of Washington* v. *Public Service*

*Commission, supra,* it was held that the fixing of public utility rates by the State through the Public Service Commission does not violate or infringe any right of local self-government.

Even under the power to exercise self-government or home rule, a city cannot act on matters purely of state concern. 43 C. J. 188; *Attorney-General* v. *City of Detroit* (1923), 225 Mich. 631, 196 N. W. 391; *Clements* v. *McCabe* (1920), 210 Mich. 207, 177N. W. 722. A municipality has no inherent rate-making power and, in the absence of constitutional or statutory authorization, cannot regulate utility rates, 43 C. J. 379, 380; *Louisville Nat. Gas Co.* v. *State, ex rel.* (1893), 135 Ind. 49, 34 N. E. 702; *Re Niagara, etc., Power Co.* v. *Prendergast* (1930), 229 App. Div.295,241N.Y.Supp.162, P. U. R. 1930D 58, 60, 61; *City of Rushville* v. *Rushville Nat. Gas Co.* (1905), 164 Ind. 162, 73 N. E. 87.

The power to fix rates may be and often has been delegated by the state to municipal corporations, *Muncie Nat. Gas Co.* v. *City of Muncie* (1902), 160 Ind. 97, 66 N. E. 436; *City of Noblesville* v. *Noblesville Gas Co.* (1901), 157 Ind. 162, 60 N. E. 1032; *Westfield Gas Co.* v. *Mendenhall* (1895), 142 Ind. 538, 41 N. E. 1033; *City of Rushville* v. *Rushville Nat. Gas Co.* (1892), 132 Ind. 575, 28 N. E. 853, but authority so given is subject to legislative control, and when the Legislature delegates to the Public Service Commission the exclusive power of regulating rates, that grant supersedes any grant theretofore made to cities (except where existing franchises exist) and becomes the prevailing law of the state. *Re Northern States Power Co.* (1920), (N. D.) P. U. R. 1921A 121; *Bartlesville* v. *Corporation Commission* (1921), 82 Okla. 160, 199 Pac. 396, P. U. R. 1921E 509; *York Water Co.* v. *York* (1915), 250 Pa. 115, 95 Atl. 396; *Winfield* v. *Public Service Commission, supra;* *State, ex rel.,* v. *Lewis* (1918), 187 Ind. 564, 120 N. E.

129; I McQuillen, Municipal Corporations (2d ed.) §§249-252, p. 639-644. In recent cases, this court has held that, to safeguard the public interest and promote public convenience and necessity, the right and power to regulate service, to fix rates and to prevent ruinous and unrestricted competition were given to the Public Service Commission and that the act creating the commission conferred upon it all the powers of control over utilities theretofore enjoyed by municipalities (save and except such control as was reserved to municipalities over streets). *Stuck* v. *Town of Beech Grove* (1928), 201 Ind. 66, 74, 163 N. E. 483; *City of Vincennes* v. *Vincennes Traction Co.* (1918), 187 Ind. 498, 120 N. E. 27; *Public Service Comm.* v. *City of Indianapolis* (1922), 193 Ind. 37, 47, 137 N. E. 705; *Denny* v. *Brady, Rec.* (1928), 201 Ind. 59, 63, 163 N. E. 489.

The cases cited in the foregoing paragraphs relate to the regulation of rates to be charged by privately owned public utilities. The same reasons exist for regulation of the rates of municipally owned utilities, and the power to regulate them is likewise in the state. *Springfield Gas Co.* v. *Springfield, supra; Kennebunk, etc., Water District* v. *Town of Wells, supra,* P. U. R. 1930A 173, 175; McQuillen, Municipal Corporations (2d ed.) §554. In *Re Niagara, etc., Power Co.* (1930), 229 App. Div. 295, 241 N. Y. Supp. 162, P. U. R. 1930D 58, in a case involving the regulation of the rates of a municipally owned electric-light plant, it was held that "a municipality has no inherent rate-making power. It is simply a political subdivision of the state and exists by virtue of legislative enactments. Rate regulation is a matter of the police power of the state. . . . The rate-making power is a legislative function, and necessarily involves legislative discretion. . . . The right to regulate public utility rates is a power vested in the state. It may be delegated to the municipality but such an

intent must clearly appear. Every doubt must be re-
solved in favor of the continuance of the power in the
state."

The appellant, in attempting to show that state regu-
lation of the rates of municipally owned public utilities
interferes with the right of local self-government,
says: "The interests to be protected by govern-
mental rate fixing in the case of a municipally
owned utility are the interests of the citizens of the
municipality," and "the citizens of the State generally
are not concerned and their interests are not affected."
This argument is one which can be made as well regard-
ing state regulation of the rates of privately owned utili-
ties. While it is true that the regulation of rates of a
utility (whether owned privately or by a municipality)
usually affects the citizens of a particular municipality
more than it does the citizens of the remainder of the
state, yet the state, for reasons which the legislative de-
partment deemed sufficient, has determined, as it had
the right to do, that regulation should be by a central
commission, rather than by delegating such regulatory
power to the local communities.

In several cases, reviewed in a footnote,[2] courts· have
held that public utility commissions of their states had

[2]In *Holyoke* v. *Smith* (1924), 75 Colo. 286, 226 Pac. 158, there was a
"home rule" amendment to the state constitution under which it was
held that any town in the appellant's class might free itself from the
jurisdiction of the commission, and, in *Logan City* v. *Public Util.
Comm.* (1928), 271 Pac. (Utah) 961, P. U. R. 1929-A 378, it was held
that it was not the intention of the Legislature to delegate power over
municipally owned utilities by its Public Utilities Commission Act by
reason of the language of the act and of subsequent acts "indicative of
an intention that the power of a municipality owning and operating its
own utility to fix and determine its own rates and charges." The de-
cisions in *Holyoke* v. *Smith, supra,* and *Logan* v. *Pub. Util. Comm.,
supra,* were based also on the conclusion that a provision of the state
Constitution (in each state) that "the general assembly shall not dele-
gate to any special commission . . . any power to . . . perform any
municipal function" prevented a public utility board or commission
from supervising or controlling the rates of a municipally owned utility.
In so deciding, these courts disregarded the better reasoned case of
*Public Service Commission* v. *Helena* (1916), 52 Mont. 527, 159 Pac. 24,

no power to regulate the rates of municipally owned utilities, but each of these cases is readily distinguished from the case at bar.

Our conclusion upon the question presented by the first paragraph of complaint is that the state has the power to regulate, either directly or through a public service commission, the rates to be charged for utility service by a municipally owned public utility. And this we hold regardless of whether the city possesses its power to operate such plant by legislative grant or as an implied or inherent right, and regardless also of whether the city, in operating the utility, is considered as acting in its governmental or in its private business capacity.

II. *The Spencer-Shively Act, creating the Public Service Commission, expressly applies to municipally owned utilities and such commission has authority thereunder to fix the rates to be charged the public by the city of Logansport for electric current. §§101 and 102 of the act do not limit its application except in the case of utilities operating under existing franchises which regulate rates.*

P. U. R. 1916F, 389, wherein, under the same constitutional provision and a similar statute, it was held that a public service commission was not a special commission and, in effect, held that, in regulating such rates, it exercised a state and not a municipal function. In *Los Angeles Gas and Electric Corp.* v. *City of Los Angeles* (1922), 188 Cal. 307, 205 Pac. 125, it was said: "The sale and distribution of electrical energy manufactured by a city is a municipal affair, and one over which the Legislature of the state has no control." The city was "empowered by its charter to develop and sell electrical power" and the question there involved was whether the city had violated a charter provision "which prohibits the sale by the city of its electrical energy at wholesale unless authorized so to do by a two-thirds vote of the electors of the city." The court pointed out that "The powers of the city of Los Angeles are not derived from the Legislature but from a freeholders' charter directly provided for by the Constitution." In *Barnes Laundry Co.* v. *Pittsburgh* (1920), 266 Pa. 24, 109 Atl. 535, the court in its opinion "called attention to every provision of the act [creating the Penna. Pub. Ser. Comm.] which relates to or in any material aspect mentions municipalities" and held that "the review thus made forces the conclusion that such corporations are neither utilities within the term 'public service companies' as used in the statute, nor are they embraced in its rate-making provisions; further, that they are not subject at all to the jurisdiction of the Public Service Commission beyond the 'limited extent' provided in parts of the act," etc.

The theory of the second paragraph of complaint is based on appellant's contention that, "nowhere in the Public Service Commission law are found express words granting jurisdiction to the commission to regulate the rates of any public utility except in cases where a utility has surrendered its operating contract and accepted an indeterminate permit from the commission." This contention is erroneous and in direct conflict with the plain and clear provisions of the law. Section 1 of the act (§12672 Burns 1926) provides that:

"The term *'public utility,'* as used in this act, shall mean and embrace . . . every city or town that now or hereafter may own, operate or control . . . any plant or equipment within the state . . . for the production, transmission, delivery or furnishing of heat, light, . . . or power, either directly or indirectly, to or for the public."

Section 7 of the act (§12678 Burns 1926) provides:

"The charge made by any *public utility* for any service rendered or to be rendered, either directly or in connection therewith, shall be reasonable and just and every unjust or unreasonable charge for such service is prohibited and declared unlawful," etc.

Section 72 of the act (§12743 Burns 1926) provides that:

"whenever . . . the commission shall find any rates . . . to be unjust, unreasonable . . . or otherwise in violation of any of the provisions of this act, the *commission shall* determine and by order *fix* just and reasonable *rates,*" etc.

Other sections of the act provide:

"for the valuation of all property of every public utility by the commission" (§9); that every public utility shall keep and render to the commission prescribed accounts for examination and determination of rates, tolls, etc. (§13), shall file schedules *showing all rates* which shall exceed a certain standard, and that no change of rates shall be made except by approval of the commission (§§41, 45).

Section 124 of the act (§12797 Burns 1926) provides that:

"The *commission* . . . *shall have the power*, and it shall be its duty, *to enforce* the provisions of this act, as well as all other laws relating to public utilities."

Section 101 of the act, as amended by §1, ch. 93, Acts 1921 p. 197 (being §12774 Burns 1926), upon which appellant relies to support its contention (under the second paragraph of complaint), provides that: "any public utility operating under an existing license, permit or franchise from any county, city or town" . . . shall, upon filing (within a given time) a declaration surrendering its franchise "receive by operation of law in lieu thereof an indeterminate permit." Section 102 of the act (§12775 Burns 1926) provides that, by the acceptance of such an indeterminate permit, any public utility is "deemed to have consented to a future purchase of its property by the municipality in which the major part of it is situate" and to have waived its rights relative to condemnation and "to have consented to the revocation of its license, permit or franchise by the commission for cause."

Manifestly, the utility here involved does not belong to the class of utilities mentioned in the foregoing sections (§§101 and 102). It could not surrender a franchise, for the very good reason that it is not operated under a franchise, but is operated by, and it is, the city itself. The question then to be decided under this paragraph of the complaint is whether the Spencer-Shively Act (and its amendments) applies to any public utilities other than those which were operating under existing franchises, surrendered those franchises and accepted indeterminate permits? We have already pointed out that, by the plain terms of the act, it applies to all "public utilities" which it defines, and there remains for consideration only the question as

to whether §§101 and 102 limit the application of the law in the manner contended for by appellant.

In *Greensburg Water Co.* v. *Lewis* (1920), 189 Ind. 439, 128 N. E. 103, it was said: "By §§101 and 102 of the act . . . the State of Indiana made a proposal to the public utilities of the state operating under franchise contracts then existing . . . that any such utility might surrender (within a certain time) its franchise contract to the state and be released from the obligations thereby imposed on certain terms and conditions specifically stated in the act." While these sections may limit the law in its application to utilities operating under existing franchises, they certainly do not confine the operation of the law to those utilities alone which were operating under and which surrender existing franchises. The law includes and applies to all that are within its definition of the term "public utility" in §1 of the act, whether operating without a franchise or under a franchise (subject to the terms of the franchise), whether in existence at the time the act was passed, or coming into existence at a later time (and all that are within classes which may be added thereto later, e. g., motor vehicle common carriers in §1, ch. 46, Acts 1925, §10164 Burns 1926, *Stuck* v. *Town of Beech Grove, supra*).

Sections 101 and 102 of the act do not serve to exempt from the operation of the Public Service Commission Law, utilities operating under existing county, city or town franchises, except in so far as the terms of those franchises may conflict with provisions of the law. Thus, where a franchise from a city under which a public utility is operating does not regulate the rates to be charged by such utility, the Public Service Commission has recently exercised authority to regulate its rates, regardless of the fact that the utility has never surrendered its city franchise and accepted an indeter-

minate permit, *Re Home Telephone Co. of Portland* (No. 9716-1929) P. U. R. 1930A 332.

We conclude that the Spencer-Shively Act creating the Public Service Commission expressly applies to municipally owned utilities and that such commission has·authority thereunder to fix the rates to be charged the public by the city of Logansport for electric current.

III. *A municipally owned utility is entitled to receive a fair return by way of interest upon the investment the same as a privately owned utility and the matter of earning such return or not is one of policy for the municipal authorities.*

In deciding adversely to appellant the question which is presented by its third paragraph of complaint, the lower court thereby upheld the order of the Public Service Commission. This order, which we believe to be erroneous, directly contravenes the rulings in several cases theretofore decided by the Indiana commission, as well as the holdings in many cases decided by other commissions and courts. Every public utility, whether municipally or privately owned, is justly entitled to a fair return upon the reasonable value of its property devoted to public use, over and above operating expenses, taxes and depreciation, *Re Hammond Water Works*, P. U. R. 1919A 183, and we approve the following language used by the Public Service Commission, in speaking of the return to be earned by a municipally owned plant in *Re Bluffton*, P. U. R. 1921B 716:

"The law contemplates that adequate service be rendered to the public by this, as well as all other public utilities, and that the utility be permitted a rate that will yield revenue sufficient to meet its operating expenses, including taxes and proper allowance for depreciation and, *in addition, a fair return upon the value of the property used*, and useful, for the convenience of the public. The respondents

contend that à municipal utility should not be permitted to earn any return above its actual operating expense, including depreciation. *The Commission believes that the matter of earning a return or not earning a return is one of policy to be decided by the municipal authorities.* In any case there should be some surplus to take care of emergencies over and above the operating expenses. *The Commission believes that a municipal utility, like any other public utility, is entitled to earn a reasonable return on the value of its property, if it so desires."* (Our italics.)

The commission has allowed, upon the fair value of such property, a return of six per cent, *In re Goshen* (No. 4354, Jan. 11, 1919); seven per cent, *In re Hammond Water Works, supra,* and seven and one-half per cent, *In re Linton,* P. U. R. 1921E 295. See, also, *Re Connersville,* P. U. R. 1922C 482; *Ross* v. *Frankfort,* P. U. R. 1919B 525.[3] (These citations are made, not to the point that any particular percentage of return is reasonable and fair for a municipally owned utility to earn, that being a matter that may vary under different conditions, but to the point that the Public Service Commission has in previous cases determined and allowed that which it believed to be a fair and reasonable return to municipally owned utilities.)

[3]In a former proceeding involving the rates of the Logansport municipal electric plant, the Public Service Commission said:

"The schedule of rates herein authorized will yield sufficient revenue to meet the operating costs including depreciation, and also the interest on the electric light and power department bonds now outstanding and to be issued and to provide a sinking fund for the amortization of such bonds. The rates herein authorized will yield approximately 7 per cent on the value of the property and it is believed that the rates will yield sufficient revenue and no more than sufficient revenue to meet the proper and legal requirements of the department. There is no good reason for permitting the department to earn more than its needs and in no case should the taxpayers be required to make up a deficit." *In re Logansport* (No. 6265, Nov. 25, 1921), P. U. R. 1922B 669.

(In the present controversy, the commission found the value of the property to be $933,750. It does not appear what per cent on this valuation its earnings now amount to. The appellant alleges in its complaint in this proceeding that the value of the property is $1,-300,000.)

It is uniformly held in other jurisdictions that a city is entitled, if it so desires or elects, to earn a return upon its investment commensurate (*Skogmo* v. *River Falls, infra; Cavanaugh* v. *Whitefish Mun. Water Utility, infra; Knowlton* v. *Farmington Village, infra; Re Kenosha, Wis. Ry. Com.* P. U. R. 1918D 751; *Consolidated Ice Co.* v. *Pittsburgh* [1922], 274 Pa. 558, 118 Atl. 544), with what would be reasonable in the case of a private corporation and which would constitute a fair return on such property. *Spangler* v. *Great Falls Municipal Water Plant* (Mont. Pub. Ser. Comm.) P. U. R. 1927E 274; *Botts* v. *City of Brookfield* (Missouri Pub. Ser. Comm.) 4 Mo. P. S. C. R. 631, P. U. R. 1917D 224; *Smith* v. *Village of Fennimore* (Wis. Ry. Comm.) P. U. R. 1916A 853; *Skogmo* v. *River Falls* (Wis. Ry. Comm.) P. U. R. 1917E 974; *Re Milwaukee* (Wis. Ry. Comm.) P. U. R. 1927B 229; *In re Broadhead Municipal Electric Utility* (Wis. Ry. Comm.) P. U. R. 1915B 524; *Re Higginsville* (Missouri Public Service Comm.) P. U. R. 1921D 798; *Chicago* v. *Northwestern, etc., Ins. Co.* (1905), 218 Ill. 40, 75 N. E. 803; 1 L. R. A (N. S.) 770; *Culver* v. *Jersey City* (1883), 45 N. J. Law 256; McQuillen, Munic. Corps. (2d ed.) §1948. The Montana Public Service Commission in *Cavanaugh* v. *Whitefish Municipal Water Utility*, P. U. R. 1922E 209, said:

"Ordinarily, of course, a municipality is satisfied to do with a less return than would be fair to a private concern under similar circumstances, due both to its usual ability to procure money at a smaller rate of interest, and its willingness to forego the profit that is the actuating motive for private investment, in order to benefit its citizens. Indeed, the willingness to sacrifice profit, or in other words, to avoid the tribute to private capital, is almost invariably the inducement (and always a persuasive argument) for municipal ownership. But after a plant has been installed, the city, representing its

inhabitants, may determine that it is best to operate on a profit-making basis, and it is entitled, if it so desires, to earn a return upon the investment commensurate with what would be reasonable in the case of a private corporation."

The Indiana Public Service Commission in *Re Hillis, supra,* and the lower court in the case at bar, have apparently adopted some of the (unhappily chosen) language used in *Bonzer* v. *Electric Light Comm.* P. U. R. 1920F 183, which has been misinterpreted and which has led to error. In *Bonzer* v. *Electric Light Comm.* the Maine Public Utilities Commission said:

"The people as a whole own this property and are operating it for the benefit of all. . . . It is not expected that there will be any profit. . . . It is our idea that if the town desires to render this service to its own people, or to some of its own people, it shall do so without profit,"

but qualified its definition of "cost" or "of doing business without profit" by holding that the utility should be allowed to earn enough, not only to pay operating expenses and to care for depreciation, but also to provide a sinking fund to pay off the bonded indebtedness standing against the plant. In *Knowlton* v. *Farmington Village Corporation,* P. U. R. 1918E 884, the same commission held that a municipality operating a water plant may divert the receipts therefrom to the payment of its general corporate obligations, if it so desires, provided its charges to the consumers are reasonable; that the municipality, if it so elects, may earn more than enough to pay operating expenses and "current interest charges" (but that such sexces is justifiable only as a provision for the payment of the indebtedness for the plant and that, when the indebtedness is paid, the rates should be reduced).

It does not follow from a premise that service is to be

rendered at cost, that a reasonable interest on the investment does not constitute a part of that cost. Even in the case of privately owned utilities, it was said in *Re Hammond W. & E. C. Ry. Co.* (Ind. Pub. Ser. Comm.) P. U. R. 1920E 517, 522, that:

"Under present day circumstances and under the theory of the Public Service Commission Act, public utilities are required to render service at *cost*, that is to say, the cost of operation, including taxes and depreciation and the *cost of money necessarily invested.*" (Our italics.)

It is argued by appellees that no return should be allowed as interest on the investment because the purpose of municipal ownership is to "serve the public and not to produce revenue" and that "local taxes should not be gathered in the guise of utility rates." It appears to us that the purpose of municipalities which have decided to own utilities may have been to reduce the cost of the service to their users and at the same time to secure a reasonable return on the investments for the cities which otherwise would go to private corporations. The taxpayer who is not an electric light consumer has his money tied up in a municipal light plant the same as the taxpayer who is also a consumer. It is unfair that the money obtained from the former by taxation should be allowed to work only for the benefit of others. It should earn a reasonable amount which should go to the general fund of the city and thereby reduce his taxes. Local taxes should not be gathered in the guise of utility rates, but rates which provide for no more than a reasonable interest return on the investment are not local taxes in disguise. The following language used in *Cavanaugh* v. *Whitefish, etc., Utility, supra,* is particularly applicable to the subject under discussion:

"The utility should pay the city as an investor a reasonable amount for interest on the city's investment recruiting the interest, equitably, through rates charged all consumers including the city as a consumer. If the plant has been built out of the general funds of the city, the city is an investor in the utility and is entitled to a reasonable rate of interest on the investment. The money in this case, being furnished out of the general funds of the city, was derived from local taxes. The investment of these funds in other lines would bring a return to the city in the form of interest and would consequently decrease the amount of taxes required to be levied by the amount of this interest. Where funds are borrowed for plant investment, the interest cost is plain. Interest is always one of the elements in the cost of furnishing service. Unless the city is paid a reasonable amount for interest, the rates for private users will be lower than the actual cost of serving them, and taxes will eventually have to be increased to make up the deficit. This would result in discrimination against taxpayers in favor of private consumers. Ordinarily the rate of interest allowed corresponds with the rate being paid on the bonded indebtedness or what would have to be paid were the plant bonded. The plant should render not only actual interest requirements, decreasing in dollars as the indebtedness is amortized, but the going interest rate on its value. For instance, if the water rates should produce only enough to pay the actual interest where bonds were amortized to a figure under plant value, there would be no inducement to retire bonds, because as they are retired and the interest payments become smaller, the demand would come for rates yielding less revenue. On the other hand, if interest is allowed on the investment, it would be to the city's interest to retire the bonds as rapidly as possible and earn the interest itself, holding it in reserve for proper purposes."

IV. *A municipally owned utility is not entitled, in addition to a reasonable return upon its investment, to charge rates to yield a sum sufficient to compensate*

*the city for the taxes which would be paid upon the plant if it were privately owned.*

Appellant's contention in its fourth paragraph of complaint that the rate is insufficient because it does not yield a sum sufficient to compensate the city for the taxes which would be paid upon the plant if it were privately owned, was, by the sustaining of the demurrer, correctly denied. "The property of any county, city, town or township" which is exempted from taxation by clause 2, §14037 Burns 1926, includes the electric-light plant here·involved. Where a city purchases and operates a public utility the effect, so far as taxation is concerned, is to withdraw from the tax duplicate the amount for which such property was assessed. The additional tax burden thus created must be borne by the taxpayers generally unless an amount at least equal to these taxes can be earned by the utility and placed in the general fund of the city. The Wisconsin Railroad Commission has, in a number of cases, held that municipally owned utilities which are exempt from taxation (*Re Board Water Commissioners*, P. U. R. 1918F 79), may include as a part of the operating expenses local taxes, excluding state and county taxes (*Re Milwaukee*, P. U. R. 1927B 229), on the theory that they would be collected and placed in the general fund of the city if the plant were privately owned and operated (*Re Mukwanagok* P. U. R. 1922B 109), in order that justice may be done between the consumers and general taxpayers (*Re Hartford*, P. U. R. 1919F 216), and to maintain an equitable relationship between them (*In re Fennimore*, P. U. R. 1916A 848; *Re LaCrosse*, P. U. R. 1924A 586; *Re Kankanna,* P. U. R. 1922C 839). By our decision on the question presented by appellant's third paragraph of complaint to the effect that a municipally owned utility is entitled to operate at a reasonable profit, we believe that this manifest unfairness to the taxpayers

is avoided, and this court is unwilling to go further and hold that, in addition to a reasonable profit, such utility is entitled also to increase its rate to cover the amount of taxes which it does not pay. A city, by its citizens and taxpayers, in deciding to operate a utility, must have in mind, not only the advantages gained thereby, such as the elimination of official salaries, the power to finance its project at advantageous interest rates, etc., but also the provision of the law which exempts the property of a city from taxation. Taxes not being actually levied and paid, they should not be included as a cost of service. *Cavanaugh* v. *Whitefish Mun. Water Utility, supra* (Mont. Pub. Ser. Comm.) P. U. R. 1922E 198, 216.

The judgment is reversed, with directions to the trial court to overrule the demurrer to the third paragraph of the complaint.

Myers and Travis, JJ., dissent.