BOARD OF DIRECTORS FOR UTILI-
TIES OF the DEPARTMENT OF PUB-
LIC UTILITIES OF the CITY OF IN-
DIANAPOLIS, As Successor Trustee of
a Public Charitable Trust d/b/a Citi-
zens Gas & Coke Utility, Appellant (Pe-
titioner Below),

v.

OFFICE OF the UTILITY CONSUMER
COUNSELOR, Public Service Commis-
sion of Indiana, Appellees,
Citizens Action Coalition of Indiana, Inc.,
Industrial Energy Consumers, Nelson
G. Grills, Appellees (Intervenors Be-
low).

No. 2–783–A–233.

Court of Appeals of Indiana,
Second District.

Feb. 7, 1985.

William P. Diener, Indianapolis, Michael B. Cracraft, Smith, Morgan & Ryan, Indianapolis, for appellant.

Ronald L. Dyer, Indianapolis, for appellee, Office of the Utility Consumer Counselor.

SULLIVAN, Judge.

The Board of Directors for Utilities of the Department of Public Utilities of the City of Indianapolis, Successor Trustee of a Public Charitable Trust d/b/a Citizens Gas & Coke Utility (Citizens Gas) appeals from a Public Service Commission (Commission) order entered on June 20, 1983. The Commission's Order (Order) disallowed the portion of Citizens Gas' proposed revenue requirements which requested a four percent return on net utility plant, and separate line amounts for working capital and extensions and replacements.

On appeal, Citizens Gas states five issues which can be consolidated as follows:

1. Whether the Commission's findings disallowing revenues for a rate of return and working capital and limiting the amount for extensions and replacements are supported by substantial evidence pursuant to I.C. 8–1–2–96. (Burns Code Ed.1982, Compiler's Notes)

2. Whether the Commission erred in refusing to allow rebuttal evidence in opposition to the Commission's Staff Reports admitted into the record pursuant to I.C. 8–1–1–5. (Burns Code Ed.1982)

3. . Whether the Commission erred in discussing miscellaneous matters not placed in issue by the parties before it.

Citizens Gas is a municipal gas utility subject to the jurisdiction of the Commission and charged with the duty of providing gas service to Indianapolis and the surrounding communities in Marion County, Indiana. As of June 20, 1982, Citizens Gas provided service to approximately 206,838 residential, commercial, and industrial customers in Marion County. The Board of Directors of Citizens Gas is empowered to prescribe rules setting rates for service, subject to approval by the Commission.[1]

On September 17, 1982, Citizens Gas petitioned the Commission for authority to increase its existing gas service rates and charges, for approval of new schedules of rates and charges and for approval of new terms and conditions for gas service within Marion County.

After due notice a Prehearing Conference and Preliminary Hearing were scheduled and held on October 25, 1982. The Prehearing Conference is designed to expedite the hearing on the merits by encouraging the parties to discuss and stipulate to certain preliminary matters. At the Prehearing Conference, appearances were entered on behalf of Citizens Gas, and on behalf of the consumers by the Office of the Utility Consumer Counselor (Consumer Counselor). Thereafter, Citizens Gas filed a supplemental petition requesting approval to implement rates and charges sufficient to produce annual revenues of $290,-

---

**1.** I.C. 8–1–11.1–3(c)(9) (Burns Code Ed.1982).

340,178, an increase of $31,317,798 over past operating revenues.[2]

Between the Prehearing Conference and commencement of the public hearing, the Commission granted the Petitions to Intervene of three additional parties, Citizens Action Coalition of Indiana, Inc., Industrial Energy Consumers, and Nelson G. Grills. All petitions were granted subject to the state of the record as of the date of intervention. None of the intervenors below have filed an Appellee's response to Citizens Gas' appeal of the Order.

The public hearing commenced on February 1, 1983. Citizens Gas presented evidence in support of its requested rate increase. Following evidence taken on February 2, the hearing was continued to March 21 and 22 to allow evidence in opposition to the rate increase and to afford members of the general public an opportunity to testify and challenge the proposed increase.

On March 22, over the objections of Citizens Gas, the Commission admitted into the record three reports made by its own staff. Staff Report 2 was thereafter struck from the record as not prepared under the direction of the Commission and is not at issue in this appeal.

Staff Reports 1 and 3 recommended an increase of rates and charges sufficient to provide Citizens Gas an additional $18,879,-764 and $18,571,642, respectively, in annual operating revenues. The Order permitted an increase of $11,545,043 in annual operating revenues, denied the requested amount for working capital and limited the allowance for extensions of services and replacements of existing facilities. The requested rate of return of four percent of net utility plant, $5,462,769, was also denied as unnecessary and unreasonable in light of Citizens Gas' "sound physical and financial condition."

In addition, the findings discussed several miscellaneous, extrinsic matters, not placed in issue by any of the parties. The Commission made critical references to an apparent dispute over management and operation of the utility as indicated by an unsworn written statement of the Mayor of Indianapolis. The Commission also alluded to the failure of the chief executive officer of Citizens Gas to appear and defend or explain salary increases and other management decisions. The findings and Order also included a prohibition against further charitable contributions by Citizens Gas and threatened to require personal indemnification for future contributions from the trustees, officers and directors.

Subsequent to the Order and pending appeal, the Tariff Division of the Engineering Department of the Commission approved a new schedule of rates and charges which permitted Citizens Gas to collect the higher of the rates fixed by the Order or the previous rates.[3]

The Commission is vested with authority to approve a municipal utility's rates and charges which are reasonable and just, in accordance with the factors enumerated in I.C. 8-1-2-96.[4] On appeal, the Commis-

---

2. In its final post-hearing brief, Citizens Gas amended its request for an annual operating revenue increase to $30,206,492.

3. I.C. 8-1-3-6 (Burns Code Ed.1982).

4. Following is the full text of I.C. 8-1-2-96, which was the applicable provision on the date of Citizens Gas' petition to the Commission:

"Every municipality owning or operating a utility under this chapter is required to furnish reasonably adequate services and facilities. The charge made by any such municipality for any service rendered or to be rendered, either directly or in connection therewith, shall be nondiscriminatory, reasonable and just, and every discriminatory, unjust or unreasonable charge for such public service is prohibited and declared unlawful. Whenever a municipality operates an electric utility that provides service outside the corporate limits of the municipality, the rates and charges for service outside the corporate limits may not differ from the rates and charges for service inside the corporate limits unless the utility clearly demonstrates significant cost factors which make different rates and charges nondiscriminatory, reasonable, and just. 'Reasonable and just charges for services' within the meaning of this section means charges which produce sufficient revenue:

(1) To pay all the legal and other necessary expenses incident to the operation of such utility, including maintenance costs, operating charges, upkeep, repairs, depreciation, and interest charges on bonds or other obligations;

sion's decision and findings are subject to a two-tiered standard of review.[5] *Citizens Action Coalition v. Public Service Commission* (4th Dist.1983) Ind.App., 450 N.E.2d 98, 101, *reh. denied; L.S. Ayres & Co. v. Indianapolis Power & Light Co.* (2d Dist.1976) 169 Ind.App. 652, 661, 351 N.E.2d 814, 821, *tr. denied; City of Evansville v. Southern Indiana Gas and Electric Co.* (2d Dist.1975) 167 Ind.App. 472, 482, 339 N.E.2d 562, 571.

 Initially, the Commission's decision or order must include basic findings upon all material facts in issue. These findings must be drawn with sufficient specificity to enable the Court of Appeals to intelligently review the decision. The degree of specificity required will vary in each individual case depending upon the factual complexity and the amount and quality of evidence introduced. *Perez v. United States Steel Corp.* (1981) Ind., 426 N.E.2d 29, 33; *Charles W. Cole & Son, Inc. v. Indiana & Michigan Electric Co.* (1st Dist.1981) Ind.App., 426 N.E.2d 1349, 1353. The basic findings, however, must provide the underlying reasons from which the ultimate findings or conclusions will reasonably flow. As stated by the Indiana Supreme Court, "[the] findings of basic fact must reveal the [Commission's] analysis of the evidence and its determination therefrom regarding the various specific issues of fact which bear on the particular claim." *Perez, supra,* 426 N.E.2d at 33. A finding is insufficient if in fact it is merely a summary or recitation of the evidence which does not manifest the Commission's expertise in analyzing such evidence. *Talas v. Correct Piping Co.* (1981) Ind., 426 N.E.2d 26, 28.

 At the second level of review, the Court determines whether the Commission's basic findings of fact are supported by substantial evidence of record. *Capital Improvement Board v. Public Service Commission* (2d Dist.1978) 176 Ind.App. 240, 245, 375 N.E.2d 616, 622. In this respect, the court is not empowered to substitute its judgment for that of the Commission and where a reasonably sound basis of evidentiary support exists, the Commission's findings will be upheld. *L.S. Ayres & Co., supra,* 169 Ind.App. at 664, 351 N.E.2d at 823.

With these principles in mind, we turn to the specific issues presented upon appeal.

## I.

Citizens Gas alleges error in the Commission's findings regarding the requested amounts for a rate of return, for working capital and for extensions and replacements. Specifically, Citizens Gas argues that the findings are unsupported by sub-

(2) To provide a sinking fund for the liquidation of bonds or other evidences of indebtedness;

(3) To provide adequate funds for working capital;

(4) To provide adequate funds for making extensions and replacements; and

(5) To provide funds for payment of any taxes that may be assessed against such utility. The public service commission shall approve charges which are sufficient to include a reasonable return on the utility plant of the municipality, if the governing board or council of the municipal utility so elects. It is the intent and purpose of this section that such charges produce an income sufficient to maintain such utility property in a sound physical and financial condition to render adequate and efficient service. Any rate too low to meet the foregoing requirements is unlawful. Except for a municipal utility taxed under IC 19-3-23-1 [Repealed. For present law see disposition table at Title 36],

the public service commission shall approve charges which are sufficient to compensate the city or town for the taxes due the city or town which would be paid on the utility property were it privately owned. These funds in lieu of taxes may be transferred to the city or town general fund if the governing board or council of the municipal utility so elects. Except for a municipal utility subject to IC 19-3-24-11 [Repealed. For present law see disposition table at Title 36], at the option of the governing board or council of the municipal utility, surplus funds of the municipal utility may be transferred to the general fund of the city or town."

I.C. 8-1-2-96 was repealed and superseded by I.C. 8-1.5-3-8 [Burns Code Ed.Supp.1982], effective January 1, 1983. The new section deleted some language and made other changes not here in issue, but retained essentially the same substantive provisions addressed by the parties.

5. I.C. 8-1-3-1 (Burns Code Ed.1982).

stantial evidence of record and that in fact the substantial evidence of record requires a contrary result. Citizens Gas also argues that such findings are contrary to law in that the Commission disregarded specific statutory mandates. We will address each of these contentions separately.

## A.

As part of its revenue requirements, Citizens Gas included a request for $5,462,769, which represented a four percent rate of return upon net utility plant in service.[6] During the hearings before the Commission, both Consumer Counselor and the Commission's Staff Report 3 recommended that Citizens Gas receive the requested rate of return. In this appeal, the parties present varying interpretations of I.C. 8–1–2–96, which generally directs the Commission to approve charges which are sufficient to include a reasonable return if so elected by the governing board of the utility.

Citizens Gas interprets this language to mean that once an election to include a rate of return is made by its governing board, the Commission has no discretion to deny that request to the extent that the rate of return is reasonable, and that a sound financial and physical condition does not preclude an otherwise reasonable return. Consumer Counselor initially supported Citizens Gas' requested rate of return, but on appeal contends that the rates and charges approved by the Commission actually include a ten percent rate of return, more than twice as much as requested. The Commission, however, took the position in its findings that if the utility is otherwise in a sound physical and financial condition to render the requisite service, any return is *per se* unreasonable.[7]

 Every utility, whether municipally or privately owned, is entitled to a fair return upon investment. *City of Logansport v. Public Service Commission* (1931) 202 Ind. 523, 177 N.E. 249. The plain language of I.C. 8–1–2–96 so provides and the legislative statement that the intent and purpose of the section is to assure adequate and efficient service does not preclude a reasonable return. Thus, Citizens Gas is partially correct in that the Commission must allow a reasonable rate of return if so elected by the utility's governing Board of Directors.

 However, the determination of what constitutes a reasonable return is a matter entrusted to the discretion and technical expertise of the Commission. There are myriad factors which may be appropriately considered by the Commission. It would serve no useful purpose for this Court to enumerate any such factors as may be suggested by the record before us. Suffice it to say that in determining reasonableness the Commission must set forth the factors which lead to its conclusion. Such statement, however, was not made by the Commission. Instead, it is clear from the findings before us that it was not the intention of the Commission to state that the approved rate included a reasonable return over and above an amount neces-

6. Rate of return was calculated using $136,569,-213 of net utility plant in service. This figure is the result of deducting accumulated depreciation of $60,922,705 from the original cost of $197,491,918 of Citizens Gas' Gas Operations Division.

7. Alternatively, the Commission suggested that the requested return was properly denied as the utility had not shown that it intended to transfer such return to the municipal and general fund of the City of Indianapolis. In doing so, the Commission cited I.C. 8–1.5–3–11 (Burns Code Ed.1982, effective January 1, 1983), which permits Citizens Gas' Board of Directors to transfer, from its cash reserve fund, "surplus earn-

ings of the utility to the general fund." *See* I.C. 8–1.5–3–11(a). However, even assuming that the requested rate of return would yield "surplus earnings" as defined in I.C. 8–1.5–3–11(c), the transfer to the general fund is permissive only. In addition, the statutory language in I.C. 8–1–2–96 allowing a reasonable rate of return is not made conditional upon such a transfer of earnings by the utility. An expressed intent to transfer funds may, in certain instances, bear upon the reasonableness of the return. However, the question is not before us in this appeal because the Commission stated it was not allowing any return.

sary for the rendering of adequate and efficient service.

In *City of Evansville, supra,* 167 Ind. App. at 477–79, 339 N.E.2d at 568–569, the rate of return calculation was observed to be based upon net revenues after adequate allowances for "operating expenses (*e.g.,* wages, salaries, fuel, maintenance) plus annual charges for depreciation." [8] *See also, Office of the Public Counsellor v. Indiana & Michigan Electric Co.* (3d Dist.1981) Ind.App., 416 N.E.2d 161, 163; *Citizens Energy Coalition, Inc. v. Indiana & Michigan Electric Co.* (1st Dist.1979) Ind.App., 396 N.E.2d 441, 445, *reh. denied.*

Consumer Counselor suggests that Citizens Gas' allowable revenues minus the applicable expenses in fact permits a rate of return of approximately ten percent. Consumer Counselor's contention is basically that Citizens Gas' total allowed revenues of $274,057,566 less operation and maintenance expenses, taxes, and depreciation (totaling $260,303,665) results in an amount available for return on plant of $13,753,901. This amount, $13,753,901, compared to net utility plant in service of $136,569,213 reflects a ten percent rate of return.

This suggestion is premised upon the supposition that the Commission used the same methodology subsequently articulated by the Commission in *In Re the Petition of the Town of Bainbridge,* Cause No. 37187, approved August 24, 1983. In *Bainbridge,* the Commission was implementing I.C. 8–1.5–3–8 (Burns Code Repl.1982), a revised version of I.C. 8–1–2–96, *supra,* which was the provision applicable to Citizens Gas' petition herein. The Commission explained, that

> "If the municipality also elects to 'earn a reasonable return on plant' then the . . . application of revenue requirement elements should be compared to revenue needs based upon a recognition of the following revenue requirement elements:
>
> (a) Operation and maintenance expenses, including taxes;

(b) A *depreciation* allowance and;

(c) A *fair and reasonable* rate of return on its investment in property used and useful for the convenience of the public." [Emphasis supplied] Order at 4.

The Commission then proceeded to illustrate, with particularity, how each of the revenue requirements interrelated with the overall goal of ensuring that the utility receives sufficient revenues to include a reasonable rate of return. Such was clearly not the case here.

Consumer Counselor's calculations are not supported by the findings, nor does the instant record reveal that the *Bainbridge* methodology was considered by the Commission or applied to Citizens Gas' petition. For example, Consumer Counselor's formula includes, as an allowable cost, depreciation in the amount of $8,622,216; however, the Commission made *no* finding with respect to depreciation.

Similarly, the findings with respect to the return on plant do not indicate that the Commission found that sufficient funds were included to provide a return. Instead, the Commission stated, that:

> "In our opinion, since the revenues provided by the other findings herein produce income sufficient to maintain Petitioner's utility property in a sound physical and financial condition to render the requisite service, the return requested is not reasonable. To permit the Petitioner to also earn the requested return would clearly frustrate the statute's express intent." Order at 25.

This language is susceptible to the interpretation that the Commission would not allow *any* return, reasonable or otherwise.

The position of Consumer Counselor is correct in certain respects. By including the term reasonable, the legislature clearly intended for the Commission to determine whether the requested rate of return is indeed reasonable. Furthermore, the fact

**8.** In this sense, depreciation is "allowed", not as a cash requirement for the utility's operation, but rather as partial recovery of that portion of the investors' assets (utility plant in service) which is deemed to be used up in providing service to the utility's customers.

that no party objected to the specific amount requested by Citizens Gas does not divest the Commission of its duty to determine the reasonableness of the requested return. Citizens Gas' cited authority allegedly prohibits the Commission from "ignoring" uncontroverted and unimpeached evidence. However, such case law is inapposite because it addresses a situation in which the Commission has failed to make any finding upon a particular issue. *See, City of Logansport, supra,* 202 Ind. 523, 177 N.E. 249. In these proceedings the Commission did render an ultimate finding upon the rate of return but failed to state findings of basic fact in support thereof. Thus, the mandatory aspect of I.C. 8-1-2-96, *i.e.,* "commission shall approve charges which are sufficient to include a reasonable return ..." (*see, supra,* note 4), is applicable only after the Commission determines what constitutes a reasonable rate of return.

■ It is not within this court's jurisdiction or practical ability to conduct an extensive search of the record for facts relevant to the calculation to determine whether and to what extent a rate of return is proper. *City of Evansville, supra,* 167 Ind.App. at 532, 339 N.E.2d at 598 (Sullivan, P.J., concurring in part, dissenting in part). This determination is precisely the type committed to the expertise and informed regulatory judgment of the Commission. *Citizens Energy Coalition, Inc., supra,* 396 N.E.2d at 448; *L.S. Ayres & Co., supra,* 169 Ind.App. at 676, 351 N.E.2d at 830; *City of Evansville, supra,* 167 Ind.App. at 482, 339 N.E.2d at 570.

The findings with respect to the rate of return requested by Citizens Gas are insufficient to permit an intelligent review of the Commission's determination. Upon remand, the Commission should formulate findings specifically addressing the allowance or disallowance of a rate of return together with the particular facts found, from the evidence presented, which support the Commission's decision.

**B.**

■ Citizens Gas next questions the sufficiency of the findings and the sufficiency of the evidence to support the decision that Citizens Gas had sufficient current assets and other investments on hand to provide required working capital. The need for working capital arises from day to day expenses which accrue during the period between the time of billing and the time customers actually pay for gas service. 64 Am.Jur.2d *Public Utilities* § 158 (1972). Neither the Commission nor any of the parties questioned that working capital was needed in the approximate amount of $2,104,774 but instead focused their dispute upon the source of funding for working capital.

Citizens Gas requested that working capital be provided by way of rates and charges. Thomas Trefry, preparer of Staff Report 3, agreed that working capital should be provided by rates and charges but disagreed upon the specific amount which should be allowed. Consumer Counselor in turn suggested that all working capital be borrowed and would have included an additional interest expense allowance for such borrowing. This proposal was specifically rejected by the Commission. The Commission's findings with respect to working capital are as follows:

"(iv) *Working Capital.*

\* \* \* \* \* \*

At the end of the test year, Petitioner had on hand in cash and temporary cash investments $702,213. Also listed under current assets is utility revenue bond interest of $2,863,985. Listed under other property and investments is $10,935,-414 in gas utility revenue bonds. The Commission can find no justification in authorizing rates for Petitioner to accumulate additional working capital in light of its substantial current assets and investments. Sufficient revenues are being allowed to enable Petitioner to pay all of its debt service requirements. Therefore we find that because Petitioner has sufficient current assets and other investments that there is no revenue re-

quirement for additional working capital." (Order at Record, Vol. 2, p. 235)

Evidence presented to the Commission indicates that Citizens Gas has traditionally funded part of its working capital requirement through short-term debt obligations. There was also testimony that Citizens Gas was attempting to reduce its overall debt-equity ratio; however, it is not entirely clear whether its existing overall debt ratio was actually detrimental to the utility's credit worthiness. The Commission's findings did not discuss the above testimony other than to disallow the additional interest expense. Instead, the findings listed $14,501,612 of cash, investments, bond interest and bonds and indicated that this amount was available for use as working capital.

The Commission did not address Citizens Gas' claim that only $719,000 was actually available for general purposes and the remainder was restricted in use by the terms of the utility's bond indenture. We cannot say, as a matter of law, either that $719,-000 is sufficient, or is insufficient, to cover Citizens Gas' working capital requirements, especially in view of the fact that neither the parties nor the Commission questioned the reasonableness of the figures proposed by Citizens Gas for adequate working capital, *i.e.*, $2,104,774. If the funds referred to by the Commission are indeed restricted and unavailable for use as working capital, such may dictate an adjustment of the rates and charges. If, on the other hand, it is found that the funds are not restricted, or another source of funds for working capital exists, then the Commission should enter specific findings to that effect.

Citizens Gas also asserts that it is entitled to an amount in excess of its $2,104,-774 working capital request due to the disallowance of LIFO (last-in-first-out) accounting for gas in storage. This claim is without merit because the Commission disallowed only Citizens Gas' *peculiar* LIFO method. As the Commission found, under the normal LIFO method, as units of gas are withdrawn, it is assumed that the most recent units purchased are being withdrawn first. Under Citizens Gas' LIFO method, however,

> "if it became necessary ... to withdraw three units of gas from storage two of which had been purchased for $3.00 each and one of which had been purchased subsequently for $4.00, Petitioner recorded the withdrawal of the gas from storage as if all three units had been purchased for the more recent $4.00 price."

(Order at Record, Vol. 2, p. 210–211) The extra $2.00 was then credited to a special LIFO reserve, a balancing account which represented the difference between the cost of gas charged to expense and the price actually paid when the gas became part of the inventory. The Commission properly found that use of this peculiar method had not been justified and further was not consistent with the Federal Energy Regulatory Commission System of Accounts or with Generally Accepted Accounting Principles. The Commission's findings in this regard are sufficiently clear and explicit and adequately supported by substantial evidence of record.

### C.

Citizens Gas challenges the Commission's finding on extensions and replacements and alleges that such finding is contrary to law. Citizens Gas' position focuses upon the relationship of depreciation and rate charge revenues with regard to the funding necessary for replacements and extensions. As a corollary, Citizens Gas contends that by approving a rate increase to cover only 48.47% of the amount needed for replacements and extensions, the Commission required the remainder to be borrowed and funded by long term debt. It is argued that the order in this regard is an attempt to control financial matters under the exclusive control of the Board of Directors.

 We recognize that I.C. 8–1–11.1–3 grants the Board of Directors exclusive control over the government, management, regulation, and control of the utility. The Commission is nevertheless empowered to approve rates and charges only *after* it

determines that such rates and charges comply with the provisions of I.C. 8–1–2–96 [For current law, *see* 8–1.5–3–8]. In making this determination the Commission may properly review the utility's overall financial condition including all revenue and expense aspects and may disallow, for rate purposes, excessive and imprudent expenditures. *Citizens Energy Coalition, supra,* 396 N.E.2d at 445; *L.S. Ayres & Co., supra,* 169 Ind.App. at 657, 351 N.E.2d at 819.

Depreciation, closely related to extensions and replacements, is the method by which the cost of an asset may be recovered over the asset's useful life. Each year a certain percentage of the assets is assumed to be "used up" in providing gas service to customers. This is an expense item which may be recovered through rate revenues. Normally depreciation expense, even though "paid" by rates, is not sufficient to cover the current, inflated cost of replacing a particular asset and has little relevance to costs incurred by a utility in extending service beyond its service perimeters. Consequently, rates which produce sufficient revenues to pay only the depreciation expense will rarely cover utility expenditures for extensions and replacements which exceed depreciation expense.

Indiana Code Section 8–1–2–96 states that the Commission must allow revenues sufficient

"(1) To pay all the legal and other necessary expenses incident to the operation of such utility, including ... depreciation, ... [and]

\* \* \* \* \* \*

(4) To provide adequate funds for making extensions and replacements ...."

Obviously then, the statute recognizes depreciation and extensions and replacements as separate items, although the amounts for each may have to be determined with relation to one another. Initially, I.C. 8–1–2–96 appears to grant a double recovery by listing these items separately. This seems to have prompted the Commission to preface its findings by stating that "the redun-

dant inclusion of funds for indistinct revenue requirement elements will be avoided ...." (Order at Record, Vol. 2, p. 200) However, it appears that depreciation is also included as part of the funds available to offset revenue requirements. (*See*, Attachment A to Petitioner's Proposed Findings of Fact and Order, Record at Vol. 2, p. 144) The net effect in this case is to allow the higher of depreciation expense or budgeted extensions and replacements but not both. This conclusion is further buttressed by I.C. 8–1.5–3–8 which superseded I.C. 8–1–2–96. The new section uses essentially the same language but provides that extensions and replacements are allowable to the extent not provided for through depreciation. It was apparently the legislature's intention to clarify the language of I.C. 8–1–2–96 and furnish a utility with sufficient revenues to pay for extensions and replacements only to the extent they exceed the depreciation expense.

The Commission's findings on extensions and replacements center on Citizens Gas' 1983 budget level of extensions and replacements of $13,895,715, but are devoid of any reference to the impact of the depreciation expense. Evidence was introduced which indicated that depreciation expense ranged from $8,481,005 to $8,622,216. It may have been that the Commission allowed the higher of the amount for depreciation or extensions and replacements, but this is not clear from the record because depreciation expense is not mentioned in the findings or Order.

■ The Commission erred in failing to make basic factual findings as required by law with respect to depreciation expense, clearly a material factor in determining the allowable revenues. *Perez, supra,* 426 N.E.2d at 33; *Indiana Bell Telephone Co. v. T.A.S.I., Inc.* (4th Dist.1982) Ind.App., 433 N.E.2d 1195, 1200, *tr. denied; Capital Improvement Board, supra,* 176 Ind.App. at 258, 375 N.E.2d at 630. The Commission apparently, though not explicitly, accepted Citizens Gas' proposed 1983 budget level of $13,895,715 of extensions and replacements. This figure is the higher of depre-

ciation expense or extensions and replacements and Citizens Gas acknowledges that had the Commission allowed that amount, no issue in this respect would be before us in this appeal. The findings went substantially further, however, and stated that on the average, 51.53% of Citizens Gas' extensions and replacements had been historically funded through long-term debt. The Commission therefore allowed 48.47% of $13,895,715 or $6,735,253 to be recovered through customer rates.

 The Commission's concern in this area is legitimate. Indiana Code Section 8-1-11.1-20 (Burns Code Ed.1982) grants Citizens Gas' Board of Directors discretionary authority to issue revenue obligations exempt from the Commission's general grant of authority. *Citizens Gas & Coke Utility v. Sloan* (1964) 136 Ind. App. 297, 305, 196 N.E.2d 290, 294, *reh. denied,* 136 Ind.App. 297, 197 N.E.2d 312. Through its actions here the Commission was attempting to minimize the burden of higher rates on Citizens Gas' customers by not rewarding unnecessary borrowing. Approved rates need not cover *every* contingent expense because the utility may incur debt obligations in the knowledge that ratepayers will ultimately bear the expense of fulfilling its debt service requirements. It is entirely possible for a utility to collect rates to pay for an expense item and then incur debt obligations for the identical item. Since the Commission is then obligated to approve revenues to pay debt service requirements, the utility may conceivably collect twice the amount actually necessary for a particular expense. In this respect, we note, for rate-making purposes, the Commission has authority to disallow imprudent or excessive expenditures and to adjust the proposed rates and charges accordingly. *Citizens Energy Coalition, supra,* 396 N.E.2d at 445; *L.S. Ayres & Co., supra,* 169 Ind.App. at 657, 351 N.E.2d at 819. Nevertheless, the statute defines "reasonable and just charges" in part as those which produce sufficient revenue to pay interest charges on bonds and other obligations. Clearly, in enacting this provision, the legislature contemplated borrowing by the utility. It is not proper for the Commission to attempt to punish Citizens Gas for past borrowing by, in effect, compelling it to issue more debt to finance future extensions and replacements. This is a task for the legislature.

The Commission's findings with respect to rate of return, working capital, and extensions and replacements are not sufficiently specific to permit this court to meaningfully review the Commission's actions and further are based on improper considerations outside the Commission's scope of authority. Upon remand, the Commission should detail the findings of fact and conclusions consistent with this opinion.

## II.

██ Citizens Gas next contends that the Commission's refusal to allow rebuttal evidence directed at Staff Reports 1 and 3 denied it a full, fair and impartial hearing. Staff Reports were admitted pursuant to I.C. 8-1-1-5 which governs proceedings before the Commission.

Citizens Gas is correct in asserting that a party is entitled to present its rebuttal to adverse evidence. Since we are not here presented with a challenge to the constitutionality of this statute, the critical question is whether reliance on unrebutted staff reports is statutorily impermissible, thus supporting Citizens Gas' assertion that the Commission was in fact an adverse party in the proceedings.

██ As originally enacted in 1941, this section did not authorize the Commission to examine non-adverse, staff evidence in its efforts to steer a middle course between the proposals of the utility and the interests of the consumer.[9] Introduction of evi-

9. Rates may be so low they confiscate the investors' property by requiring them to subsidize service or so high they give the investors an exorbitant or unreasonable return on invest- ment. The Commission of necessity may render its decision only after balancing these two competing interests. *Public Serv. Comm'n v.*

dence on behalf of the Commission or its staff was found to be inconsistent with I.C. 8-1-1-5(a) which directs the Commission to remain an impartial fact finding body. 70 Op.Att'y Gen. 205 (1951). A later amendment added the current language in I.C. 8-1-1-5(b) permitting staff reports to be made a part of the record when prepared at the direction of the Commission and subjecting the preparer of such a report to cross examination by any of the parties.[10] The statute does not limit the use of these reports by the Commission and to the extent that they become a part of the record and their contents may be utilized by the Commission, they are evidence. Reliance on the reports does not automatically transform the Commission into a proponent or opponent in the proceedings. To hold otherwise would place I.C. 8-1-1-5(a) in direct conflict with subsection (b), an illogical result clearly not intended by the legislature. *Murphy v. State* (2d Dist.1980) Ind.App., 414 N.E.2d 322, 324; *City of Indianapolis v. Ingram* (2d Dist.1978) 176 Ind.App. 645, 377 N.E.2d 877, 884. The reports are merely an additional tool to aid the assimilation of factually complex and technical information.

Citizens Gas cites to subsequent Commission Orders allowing rebuttal of staff reports as an admission of wrongdoing or bias by the Commission in this case. Subsequent corrective action does not of itself indicate wrongdoing or bias in the actions the Commission took or failed to take in a prior proceeding. The Commission is entitled to a change of policy, particularly where the change results in a more complete consideration of all factors involved in a rate-making proceeding.

We believe the present policy of allowing rebuttal to staff reports is well advised, but Citizens Gas has not adequately established how it was prejudiced by the intro-

duction of the staff reports and the refusal to allow rebuttal to those reports.

The Staff Reports were "adverse" to Citizens Gas to the extent they recommended rates be increased by approximately twelve million dollars less than Citizens Gas requested. Citizens Gas alleged *specific* harm or prejudice in three basic areas, rate of return, working capital, and extensions and replacements. In these areas there is no indication the Commission relied exclusively on the reports to Citizens Gas' detriment. In any event, because the Commission has been directed to reformulate and express its findings with respect to those three revenue requirements, we now hold this issue subsumed in Part I of this opinion.

### III.

Citizens Gas finally contends that the Commission exceeded its authority in directing the utility to cease making charitable contributions. We agree.

Portions of the findings and order here questioned are as follows:

"(x) *Charitable Contributions.*

Neither the Public nor Staff proposed an adjustment to eliminate charitable contributions from Petitioner's revenue requirement. Based on the Concurring Opinion in Cause No. 36361 the Commission would have expected such an adjustment to have been proposed. The record in this Cause is not sufficient to enable the Commission to ferret out the amount of money which Petitioner has spent on charitable contributions because that money is reportedly paid out of the manufacturing division. Of course that still ultimately comes from the pockets of ratepayers. *The Commission finds that Petitioner should not make any charitable contributions.* The Commission

*City of Indianapolis* (1956) 235 Ind. 70, 96, 131 N.E.2d 308, 318.

**10.** I.C. 8-1-1-5 (Burns Code Ed.Supp.1984) provides in relevant part:

"... (b) Any report, audit, examination or analysis prepared by the Commission staff at

the request or direction of the Commission may be made a part of the record of the proceeding, subject to cross-examination by any party of the person who performed or directed the preparation of the report, audit, examination or analysis."

can see absolutely no justification for a municipally owned utility using money from its ratepayers to fund charities. The Commission will call upon the trustees and directors and officers of Citizens Gas to refund to the Company any charitable contributions made by Citizens Gas and Coke Utility after the date of this order. [Emphasis in Original]

\* \* \* \* \* \*

IT IS THEREFORE ORDERED BY THE PUBLIC SERVICE COMMISSION OF INDIANA THAT:

\* \* \* \* \* \*

10. Petitioner shall cease to make charitable contributions." (Order at Record, Vol. 2, pp. 243–4; 263–4)

■ Though we might question the wisdom of Citizens Gas' charitable contributions in light of the increasing burden of charges which the consumer is expected to bear, Citizens Gas is not precluded by law in making such contributions. Again, we reiterate that the Public Service Commission need not accept imprudent or excessive utility expenditures for rate-making purposes simply because Citizens Gas' Board of Directors has authorized the expenditures. *Citizens Energy Coalition, supra,* 396 N.E.2d at 445; *L.S. Ayres & Co., supra,* 169 Ind.App. at 656, 351 N.E.2d at 819; *City of Evansville, supra,* 167 Ind.App. at 479, 339 N.E.2d at 569. The Commission may not, however, impose its own idea of fiscal corporate policy under the guise of its rate-making function. Because there was no evidence before the Commission to gauge the effect of charitable contributions on the proposed rates, the Commission erred in placing cautionary, prohibitory language to that effect in its Order.

The Commission's remarks questioning the propriety of increased compensation for Citizens Gas' officers and other criticisms grouped under the topic "General Concerns" were similarly misplaced. Citizens Gas alleges these comments illustrate the Commission's bias and impartiality but has failed to show how the rate-making process

was adversely affected. The miscellaneous remarks appear to be no more than gratuitous comments which merely reflect pressures of political discontent brought to bear on those officials charged with approving rate increases. Nevertheless, political statements, such as were made here, detract from the formality of the Commission's fact-finding quasi-judicial function. Those portions of the order and findings on charitable contributions and "General Concerns" directed at matters outside the Commission's bounds of authority, are hereby reversed.

Reversed in part and remanded for further findings consistent with this opinion.

BUCHANAN, C.J., and SHIELDS, J., concur.